463 So.2d 964 (1985)
FAUSTINA PIPE LINE COMPANY, Plaintiff-Appellee,
v.
LEVERT-ST. JOHN, INC., et al., Defendants-Appellants.
No. 84-61.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1985.
Writ Denied April 12, 1985.
*965 Moise Dennery, Donald H. McDaniel, New Orleans, for defendants-appellants.
Michael R. Mangham and Elizabeth Jane Hastings, Lafayette, Earl H. Willis, St. Martinville, for plaintiff-appellee.
Before DOUCET, YELVERTON and KNOLL, JJ.
*966 YELVERTON, Judge.
The property owner and its lessees appeal certain rulings by the trial court on an expropriation of a natural gas pipeline right-of-way through their agricultural lands. Appellants complain that the pipeline company failed to negotiate in good faith with them before proceeding to expropriation, that the company failed to prove the necessity of the right-of-way as to its location and extent, and that the court erred in failing to make an award for certain claimed damages. We affirm.
Faustina Pipe Line Company filed a petition on April 29, 1983, against Levert-St. John, Inc., Murphy Oubre, Russell Albert, and Curry Albert to expropriate a pipeline servitude and right-of-way and a valve site. Levert-St. John, Inc. is the owner of the property and the other defendants are sugar cane, rice, and crawfish lessees of a portion of the property sought to be expropriated.
All defendants filed dilatory exceptions of prematurity and vagueness, and peremptory exceptions of no right of action and no cause of action. The exceptions raised the question of whether the company had negotiated in good faith as a prerequisite to bringing the expropriation action, and also the question of the necessity for the expropriation. Defendant-tenants answered the petition and filed a reconventional demand for compensation for the property along with attorney's fees, severance damages, and consequential damages occasioned by the expropriation. Levert-St. John, Inc., the owner, answered the petition and also filed a reconventional demand for compensation for the property sought to be expropriated along with other claimed losses.
After trial on the issue of good faith negotiations, the court found that plaintiff had not negotiated in good faith with the tenants and they were dismissed from the lawsuit on motion of the plaintiff. It was thereafter stipulated by the parties that the tenants would be reinstated as defendants in the lawsuit. The trial court found that plaintiff had negotiated in good faith with Levert-St. John, Inc.
After trial on the merits, the trial court found that Faustina was entitled to expropriate the right-of-way and servitude for the pipeline as prayed for. The trial court also found that defendants failed to prove damages resulting from lost mill profits or severance losses from damage to off right-of-way property. In accordance with the stipulations, plaintiff was ordered to pay compensation to defendants for the expropriation and for damages caused to the right-of-way property by the expropriation.
A number of stipulations were made by the parties before testimony was received by the court. It was stipulated that there was a public purpose for the pipeline, and that there was a necessary purpose in that the pipeline was required to transport natural gas. There was no stipulation that the proposed route, depth of the pipe, or width of the right-of-way were necessary, these being disputed issues at the trial.
It was stipulated that the value of the timber to be taken by the proposed expropriation was $9,420. The value of the land for the permanent right-of-way and temporary work space was agreed to be $52,258. Damage to rice and crawfish property was stipulated at $600 per acre. Finally it was stipulated that plaintiff would return the land to its present condition as near as was possible, including V-ditches along the edges of the right-of-way.
Additional stipulations were made on the second day of the trial. The tenants were reinstated as defendants after they had been previously dismissed. The necessary purpose of a proposed valve site was agreed to. Damage to the sugar cane crop within the right-of-way was stipulated to be $792.41 per acre. Damages for land restoration within the right-of-way was stipulated at $163.75 per acre which figure was composed of $100 per acre for land leveling and $63.75 for weed control.
Damage to Mr. Murphy Oubre's rice and crawfish operation within the right-of-way was stipulated to be $6,120. Damage to the Alberts, who were in partnership with each other, was stipulated to be $6,852, *967 also only for damages within the right of way. Damages to Levert-St. John, Inc., within the right-of-way, excluding actual property expropriation, were agreed to be $69,217.
Damages were incurred by the defendants when the crew surveying the proposed route crossed the property. These damages were stipulated to be $816 to Levert-St. John, Inc., $477 to the Alberts, and $300 to Mr. Oubre. Finally, the parties stipulated that should the court find that lost mill profits were compensable, the damages would be $107.15 per acre for Levert-St. John, Inc., and $128.87 per acre for the Alberts. All stipulations were for damages occurring within the right-of-way only.
The issues on appeal are: (1) Did the plaintiff negotiate in good faith with Levert-St. John, Inc. before bringing the expropriation suit? (2) Did the tenants of Levert-St. John, Inc. waive the issue of good faith negotiations by voluntarily agreeing to the stipulation reinstituting them in the suit after their dismissal on the grounds that plaintiff had failed to negotiate with them in good faith? (3) Did the trial court err in finding that the location, width and depth of the plaintiff's pipeline was necessary? (4) Did the trial court err in failing to award damages to defendants for off right-of-way damages caused by the pipeline? (5) Did the trial court err in failing to award damages for lost mill profits?

(1)

NEGOTIATIONS WITH LEVERT-ST. JOHN
Negotiation is a prerequisite to bringing suit for expropriation. LSA-R.S. 19:2. The requirement is met when the expropriating authority makes a good faith attempt to acquire the property by conventional agreement. Dixie Pipeline Company v. Barry, 227 So.2d 1 (La.App. 3rd Cir.1969), writ refused, 255 La. 145, 229 So.2d 731 (1970). A determination of good faith negotiations can only be made on the circumstances of the individual case and essentially calls for a factual determination by the trial court that is entitled to great weight on appeal. Southern Natural Gas Co. v. Poland, 406 So.2d 657 (La.App. 2nd Cir.1981), writ denied, 412 So.2d 86 (La. 1982), cert. denied, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).
Faustina Pipe Line Company began negotiations with Levert-St. John, Inc. in late summer or early autumn of 1982 when Earl H. Willis, Faustina's attorney, phoned Raymon Billeaud to obtain permission to survey the property. The proposed right-of-way agreement and plats showing the location of the pipeline were sent to Billeaud along with a request that Billeaud submit any special clauses to be inserted in the agreement. Billeaud requested that a registered surveyor prepare a plat showing the proposed route and the boundary of the Levert-St. John property line. Several meetings were held between the parties, and correspondence was exchanged between the parties on numerous occasions. Faustina made several offers through its agents to Billeaud which were refused because Billeaud demanded that the pipeline be placed south of the existing pipeline. Faustina's agents unsuccessfully attempted to explain why the pipeline could not be placed south of the existing pipeline.
The trial court in its reasons for ruling on the issue of good faith negotiations between plaintiff and Levert-St. John, Inc. stated that there was no problem whatsoever in finding that good faith negotiations did in fact occur. There were many phone calls and meetings between the parties in an effort to reach agreement before the suit was filed.
There is ample evidence in the record that plaintiff met the requirement of good faith in negotiations with the owner, and this assignment of error is therefore without merit.

(2)

NEGOTIATIONS WITH TENANTS
The trial court found that the pipeline company failed to negotiate in good faith with the lessees and maintained the exception of prematurity. Promptly upon the *968 announcement of that ruling, Faustina dismissed these defendants from the expropriation suit. On the next day, however, the tenants, having reconsidered, elected to get back into the case, and under a stipulation agreed to by all parties, they were reinstituted as parties defendant. The final judgment named them as the beneficiaries of earlier stipulations covering crop damages.
Under these circumstances we deem it unnecessary to review the trial court's determination that Faustina had not negotiated with the lessees in good faith before the suit was filed. This Circuit, in Interstate Oil Pipe Line Company v. Friedman, 137 So.2d 700 (La.App. 3rd Cir.1962) and Texas Gas Transmission Corporation v. Pierce, 192 So.2d 561 (La.App. 3rd Cir. 1966), has held that the failure to negotiate in good faith before filing an expropriation suit gives rise to the dilatory exception of prematurity. Their voluntary reinstitution as defendants, in order to benefit from the stipulations regarding damages (these stipulations were themselves the result of negotiations), amounted to a waiver of their objection of prematurity. Therefore, this assignment of error has no merit.

(3)

NECESSITY OF THE LOCATION, WIDTH AND DEPTH OF PIPELINE
Article 1, Sec. 4, of the Louisiana Constitution of 1974 reads in pertinent part, as follows:
"Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss."
Although the parties stipulated that the proposed pipeline was to be built for a public purpose, it was not agreed that there was a necessary purpose. Arguing that within the necessary purpose test, are the location, depth, and size of the permanent right-of-way, and that, in meeting this test, pipeline companies have a heavier burden under the new constitution than before, appellants urge us to reverse the trial court, and to hold that the Faustina pipeline is not necessary because its location could be altered to the south side of the existing Dow pipeline, thereby resulting in it being only partially on appellants' property and closer to the south boundary line of the property.
There was substantial testimony in the case regarding this issue. Bill Delancy, plaintiff's superintendent of construction, was accepted by the court as a construction expert in the field of natural gas pipelines and pipeline route selection. Delancy was responsible for the surveying, mapping and selection of the proposed pipeline route. He testified that in his opinion the route, selected was best from both an engineering and an economical standpoint, and that it was unsound to place the pipeline south of the existing Dow pipeline. Delancy gave several reasons why the pipeline could not be built south of the Dow line. The line would have to cross a headland road, a grass airstrip, and a solid waste dump. There was insufficient space between the Dow line and a bridge. Were the pipeline placed between the Dow line and the bridge, the bridge might topple over, and the Dow line might side wash down the coulee over which the bridge and Dow line cross. Just past the coulee is a large barrow ditch which empties into the coulee. Were the line placed across the barrow ditch, the dirt covering the pipeline would wash into the coulee, forcing the plaintiff to continually haul in dirt to recover the line. A stand of timber would have to be destroyed and several ditches with culverts ranging from two to six feet in diameter would have to be crossed. The culverts would have to be removed to place the line and would then have to be replaced. An irrigation canal and a lift station would have to be crossed. Boundary markers *969 would have to be crossed which might lead to future litigation over property lines. Delancy testified that Federal Department of Transportation regulations do not specify a specific width for permanent rights-of-way, but rather state that the right-of-way must be wide enough to allow room for proper maintenance of the line. Delancy was of the opinion that a thirty foot right-of-way was needed for proper maintenance of the line.
Lawrence C. Levert, III, defendant's general manager, testified about his experiences concerning problems caused by pipeline depth. He stated that subsoiling operations are frequently performed at depths up to 28 inches, and that V-ditching with a motor patrol frequently is performed at a depth of 30 inches. He stated that rice irrigation ditches are sometimes dug substantially deeper than 30 inches. Levert testified that pipelines have caused problems when relocating ditches. Levert stated that conversion of soybean land to sugar cane production requires the creation of lateral ditches, while the conversion of soybean or sugar cane land to rice production requires the construction of a well or a large ditch to bring in water from a natural water source.
Bill Delancy testified that the proposed pipeline would be placed at a depth of 36 inches except where the pipeline crosses existing ditches, in which case the pipeline would be placed at a depth of 48 inches. He stated that the pipe would be weighted to create a negative buoyancy in areas where Malcolm Richard, plaintiff's manager of pipeline engineering, determines that weighting is necessary to prevent the pipe from rising. Delancy stated that he has experienced uncovered pipelines.
In Louisiana Resources Co. v. Stream, 351 So.2d 517 (La.App. 3rd Cir.1977) we stated that:
"It is well established in the jurisprudence of this state that a delegation of the power of eminent domain gives the grantee of the power the right to determine the location and route of the improvement and of the land to be taken for it. Such determination will not be interfered with by the courts if it is made in good faith and is not capricious or wantonly injurious, or in some respects beyond the privilege conferred by the statute. Evidence that another route is feasible is not sufficient to show that the grantee's selection constitutes bad faith, oppression, or abuse of power."
and:
"[1] The proposition that the location of property to be expropriated is within the sound discretion of the expropriator who acts reasonably and in good faith cannot be questioned. See Greater Baton Rouge Port Commission v. Watson, 224 La. 136, 68 So.2d 901 (1953); City of Westwego v. Marrero Land & Imp. Association, 221 La. 564, 59 So.2d 885 (1952); Central Louisiana Electric Company v. Covington & St. Tammany Land and Improvement Company, 131 So.2d 369 (La.App. 1st Cir.1961); United Gas Pipe Line Company v. New Orleans Terminal Company, 156 So.2d 297 (La.App. 4th Cir.1963); and Texas Eastern Transmission Corporation v. Bowie Lumber Company, 176 So.2d 735 (La.App. 1st Cir.1965)."
In no way can it be said that Faustina Pipe Line Company acted other than in good faith in selecting the location, depth, and width of the permanent right-of-way. Plaintiff made every reasonable effort to determine whether the pipeline might feasibly be placed south of the existing Dow pipeline. Plaintiff's only fault, if it was a fault, was the failure to comply with Billeaud's request for a survey of defendant's southern boundary. Defendant had the survey made personally, and this survey showed that there was not enough room along the entire boundary to construct the pipeline south of the Dow pipeline. Defendant offered no evidence to rebut plaintiff's evidence that a 30 foot permanent right-of-way was necessary for proper maintenance of the pipeline.
Depth of the pipeline is a more serious problem, due to the testimony of defendant's witnesses that pipelines create problems *970 when relocating ditches. However, defendant's witnesses' testimony concerning the depth of their ordinary agricultural operations indicate that the average depth of the pipeline of 36 inches, and 48 inches where the line crosses existing ditches, would pose no problems with the pipeline.
We agree with the trial court that Faustina met its burden in proving a necessary purpose in the location, depth, and size of the permanent right-of-way.

(4)

OFF RIGHT-OF-WAY DAMAGES
Defendant presented several expert witnesses to testify concerning damages that defendant would suffer off of the right-of-way because of the construction of the pipeline. These witnesses testified that the entire cuts through which the pipeline ran would have to be releveled because of ridges created by the soil displaced by the pipe in the trench. This releveling would require the destruction of the cane stubble in the affected cuts. Testimony was also elicited that when the soil displaced by the pipe is spread over the right-of-way, fertile topsoil becomes mixed with inferior subsoil, creating a chemical and physical imbalance which causes decreased yields. It was testified that fertilizers can correct the chemical imbalance, but not the changed physical characteristics. Lawrence C. Levert, III, testified that heavy agricultural equipment bogs down when crossing the trench.
Plaintiff presented Dr. Charles Cain, a partner in Gulf Coast Agricultural Associates and a consulting agronomist, as a rebuttal witness to defendants' evidence concerning off right-of-way damages. He was accepted as an expert agronomist in land restoration. Dr. Cain disagreed with Mr. Lauden and Dr. Ricaud concerning the necessity of releveling and replanting the entire cut through which a pipeline is constructed. He testified that spreading the soil displaced by the pipe over the 90 foot right-of-way would result in an increased height of only one-half inch, and that quarter drains placed on the high side of the right-of-way would prevent drainage problems in the affected cuts.
Dr. Cain recommended filling the pipeline trench only when there is no water in the trench to prevent the surface over the trench from settling three to four inches below the surrounding surface. He testified that settling of the trench would retard drainage within the right-of-way. He also testified that trench settlement would always occur absent perfect conditions. The recommended quarter drains, however, would prevent off right-of-way damage. Dr. Cain stated that he has had no experience in installing quarter drains.
Dr. Cain testified that spreading the subsoil unearthed by the trench over the entire right-of-way would have an undetectable effect on the productivity of the soil within the right-of-way as the one-half inch layer of subsoil would be mixed with topsoil in normal disking operations. He stated that the normal land leveling procedures followed at the end of each crop cycle would alleviate any drainage problems within the right-of-way caused by the displaced soil. He also testified that he has never seen a cut of sugar cane abandoned because of pipeline construction through the cut.
Defendants' damages within the right-of-way were stipulated to at trial, and are not at issue. The trial court accepted the opinion of Dr. Cain that there would be no loss in crop production outside the right-of-way, and that defendants failed to prove off right-of-way damages. We find no error in this factual determination.

(5)

LOST MILL PROFITS
Raymon E. Billeaud testified concerning defendants' affiliation with the St. Martin Sugar Cooperative and the effect of the relationship on defendants' business. Defendants pledge the sugar cane produced on the property to the Co-op. The Co-op pays defendant 60 percent of the value of the sugar produced. The Co-op retains 40 percent of the value of the produced sugar to pay its operating and processing expenses. Any income remaining after the *971 payment of expenses is allocated to the producer in proportion to the raw product produced by each producer. This allocation is a book entry which is called an equity. The Co-op is not a taxable entity. A producer must report his share of each year's equity as income on his tax return. Should operating expenses exceed 40 percent of the value of the sugar produced, the producer reports his proportion as a loss on his tax return.
Billeaud testified that he had been a member of the Co-op since its inception in 1974. Only once did the Co-op make a cash distribution to its members. He testified that were a member to withdraw from the Co-op, he would receive a "negotiable instrument" for his share. He had no knowledge of any members ever withdrawing from the Co-op, and was unsure whether a withdrawing member might receive cash for his share. Defendant does carry its equity share on its books as an asset.
The trial court found that defendant failed to prove any damages from lost mill profits. Raymon Billeaud stated that defendant had only once received a cash distribution from the Co-op, and that he was unsure whether defendant's equity in the Co-op would ever mature into an asset convertible into cash. Any decrease in defendant's equity in the Co-op caused by the construction of the pipeline would most probably be negligible. We find no error in this fact determination.
For these reasons, the judgment of the trial court is affirmed, appellants to pay the costs of this appeal.
AFFIRMED.